UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| CINDY M. AULD AND SCOTT B. AULD, | Civil No. 18-1303 (JRT/HB) |
| Plaintiffs, | |
| v. | MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |
| NEW PENN FINANCIAL LLC, d/b/a Shellpoint Mortgage Servicing, JOHN DOE, MORTGAGE CONTRACTING SERVICES, LLC, | |
| Defendants. | |

---

Gregory F. Kelly and Jonathan L. R. Drewes, **DREWES LAW PLLC,** 10 NE Second Street, Suite 205, Minneapolis, Minnesota 55413, for plaintiffs;

Bradley R. Armstrong and Michael S. Poncin, **MOSS & BARNETT, PA,** 150 S Fifth Street, Suite 1200, Minneapolis, Minnesota 55402, and John P. Loringer, Joseph Serge, and Sarah A. Gallas, **WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP,** 740 N Plankinton Avenue, Suite 600, Milwaukee, Wisconsin 53203, for defendants.

Plaintiffs Cindy and Scott Auld claim that Defendants New Penn Financial LLC (d/b/a Shellpoint Mortgage Servicing) ("Shellpoint"); John Doe, an unidentified Shellpoint employee; and Mortgage Contracting Services LLC ("MCS") violated the Fair Debt Collection Practices Act (the "Act"), 15 U.S.C. § 1692, and committed other torts in 2017. In Count I of their Second Amended Complaint, the Aulds allege that Shellpoint and MCS violated the Act as a result of improper communications between a property inspector

and Scott Auld. In Counts II–IV, the Aulds allege that Shellpoint and John Doe, a still-unidentified employee or agent of Shellpoint, violated § 1962(e) of the Act and committed various torts by filing a report with Hennepin County Human Services alleging that mold growing in the Auld's home put the Auld's children in danger. Defendants Shellpoint and MCS filed separate motions seeking summary judgment pursuant to Fed. R. Civ. P. 56(a) on all claims. Because the property inspector is not a "debt collector" subject to the Act's requirements and because the Aulds rely only on speculation to support their claims against Shellpoint in Counts II-IV, the Court will grant Defendants' Motions for Summary Judgment.

## BACKGROUND

### I. FACTUAL BACKGROUND

#### A. The Loan & the Shellpoint-MCS Contract

On April 28, 2005, the Aulds took out a loan against their home for $820,000 from Bank of America, N.A. and granted a mortgage in favor of Mortgage Electronic Registration Systems, Inc. (Decl. of Bradley R. Armstrong ("Armstrong Decl.") ¶ 2, Ex. A at 1, 8, Jan. 31, 2020, Docket No. 122-1.) Shellpoint began servicing the mortgage on December 1, 2016. (*See* Armstrong Decl. ¶ 3, Ex. B at 41, Docket No. 122-2; Decl. of Jonathan L. R. Drewes ("Drewes Decl.") ¶ 2, Ex. A at 1, Feb. 21, 2020, Docket No 135-1.) At the time Shellpoint began servicing the mortgage, the Aulds had not made a payment

on the mortgage since at least 2011 and were in default.[1] (Drewes Decl. ¶ 2, Ex. A at 2; see also 2d Am. Compl. ¶ 20, June 7, 2019, Docket No. 70.)

On January 13, 2017, after Shellpoint attempted to collect on the debt, the Aulds sent a cease and desist letter to Shellpoint disputing the debt and threatening legal action if Shellpoint continued to contact them. (2d Am. Compl. ¶ 24, Ex. B, June 7, 2019, Docket No. 70.)

On February 23, 2017, the Auld's attorney at Larkin Hoffman sent Shellpoint a letter informing them that he was representing the Auld's and that any responsive correspondence should be sent to Larkin Hoffman. (Drewes Decl. ¶ 3, Ex. B at 1, Feb. 21, 2020, Docket No. 135-2.) This letter indicated that the Auld's home suffered from "major construction defects" and listed many interior and exterior defects. (*Id.* at 1–2.) Among the interior defects listed was the need for "major mold abatement." (*Id.* at 2.)

Prior to all this, a year earlier, Shellpoint had contracted with MCS to conduct property occupancy inspections on those properties where Shellpoint held mortgages. (Armstrong Decl. ¶ 8, Ex G (the "Shellpoint-MCS Contract"), Jan. 31, 2020, Docket No. 122-7.) These inspections involve taking photographs of the property at issue to ensure

---

[1] Despite admitting in the Complaint that they were in default, the Aulds appear to dispute the existence of the mortgage, arguing that certain government bailouts and other unspecified insurance monies allegedly paid to prior holders of the mortgage fully settled any debts that the Auld's may owe. (*See* Deposition of Scott Auld ("Scott Auld Depo.") at 24:9–26:8, Jan. 31, 2020, Docket No. 130.)

it is occupied and maintained.  (*See, e.g.* (Armstrong Decl. ¶ 5, Ex. D, Jan. 31, 2020, Docket No. 122-4 (pictures taken from street and/or driveway.))  The Shellpoint-MCS contract includes a clause generally preventing MCS or its agents from communicating with the mortgagor(s) for any reason unless specifically instructed to by Shellpoint. (Shellpoint-MCS Contract at p. 14, § 1.15 ("Communications with Mortgagors."))

To conduct these inspections, MCS subcontracted with vendors who, in turn, contracted with individuals via Craigslist or Facebook to conduct the inspection.  (Affidavit of Dustin O'Dell ¶ 2, 3, 6, Oct. 10, 2019, Docket No. 93.)

### B. Events of May 10, 2017

On May 10, 2017, John Waldron, employed by an unidentified MCS vendor, conducted an occupancy inspection of the Auld's property.  (Armstrong Decl. ¶ 5, Ex. D; Affidavit of Gary Benavidez ("Benavidez Aff."), Ex. B at 2, 8, Dec. 5, 2019, Docket No. 112-2.)  The notes related to this inspection show that Waldron took nine photographs of the exterior of the home and property and do not suggest that Waldron saw or communicated with anyone during the inspection.  (Armstrong Decl. ¶ 5, Ex. D.)

Also on May 10, 2017, Hennepin County Human Services received a report that the Auld's home had a mold problem that posed a risk of harm to the Auld's five children. (Armstrong Decl. ¶ 6, Ex. E at 2–3, Jan. 31, 2020, Docket No. 122-5.)  Hennepin County contacted the Aulds and conducted a child protection assessment based on the report. (*Id.*)  While finding no visible mold, the report notes that Scott Auld acknowledged the

home has had issues with mold, that he was engaged in a lawsuit over the issue, and that the family was working with the city, county, and state to fix the issue. (*Id.* at 8–10.) The County closed their investigation and did not make a maltreatment finding or recommend on-going services. (*Id.* at 10.) The person that filed the report with the county has not been identified and is unknown to the parties.[2]

### C. Events of July 7, 2017

On July 7, 2017, Waldron conducted another occupancy inspection of the Auld's property, this time at the behest of vendor Champion Missouri. (Armstrong Decl. ¶ 5, Ex. D, Docket No. 122-4; Benavidez Aff., Ex. B at 2, 8, Docket No. 112-2.) During this inspection, Scott Auld confronted Waldron near the end of his driveway and made a video recording of their interactions. (Armstrong Decl., Ex. F.) The interaction begins with Scott Auld telling Waldron to "get out of here." (*Id.*) After Auld yelled at Waldron, Waldron approached Scott Auld and said, "I just want to let you know I'm just doing an occupancy check for the mortgage company." (*Id.*) Scott Auld told Waldron, "you're not supposed to." (*Id.*) Waldron responded and stated that it had been going on for a while and that Waldron's "job is just to verify you're here so that no one changes your locks." (*Id.*) Scott

---

[2] Under Minn. Stat. § 626.556, subd. 11(a) Hennepin County redacted any reference to the identity of the reporting party. The Magistrate Judge noted that if the Auld's could not identify the reporting party by using reasonable means, the Court would consider a motion for the Court to review the identity *in camera*. The Aulds, however, did not pursue this avenue of discovery. (Order at 5, November 15, 2019, Docket No. 109.)

Auld again indicated that Waldron was not supposed to be conducting an occupancy check. (*Id.*) Waldron then responded that Auld should "contact your mortgage company then," thanked Scott Auld, and walked away. (*Id.*) Scott Auld then ended the conversation by telling Waldron "don't come back." (*Id.*)

## II. PROCEDURAL BACKGROUND

The Aulds originally brought this action on May 10, 2018. (Compl., Docket No. 1.) On June 7, 2019, the Aulds filed a Second Amended Complaint alleging four counts: Count (I) for violations of §§ 1692c(c), 1692e(11), and 1692c(a)(2) against Shellpoint and MCS based on a theory of vicarious liability for Waldron's actions on July 7, 2017; and Counts (II)-(IV) for violations of § 1692e(1) of the Act, abuse of process, and slander against Shellpoint and John Doe for allegedly making a false report to Hennepin County Human Services. (Docket No. 70.)

On January 31, 2019, Shellpoint and MCS filed separate motions for summary judgment under Fed. R. Civ. P. 56(a) arguing that all claims against them should be dismissed. (Mots for Summ. J., Docket Nos. 117, 120.)

## DISCUSSION

### I. STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case, and

a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Even so, the non-moving party may not rest on mere allegations or denials but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256. If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment should be granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

II. **COUNT I: THE EVENTS OF JULY 7, 2017**

   A. **The Law**

The Aulds allege that Waldron violated §§ 1692c(a)(2), 1692c(c), and 1692e(11) of the Act when he interacted with Scott Auld on July 7, 2017 and that Shellpoint and MCS are vicariously liable.

Section 1692c(a)(2) of the Act prevents a debt collector from communicating directly with a consumer "in connection with the collection of any debt . . . if the debt

collector knows the consumer is represented by an attorney . . . and [the debt collector] has knowledge of, or can readily ascertain, such attorney's name and address," unless the attorney fails to respond to the communication in a reasonable time or the attorney consents to direct communication with the consumer.  15 U.S.C. § 1692c(a)(2).

Section 1962c(c) requires a debt collector to cease direct communication with the consumer if the consumer if the "consumer notifies a debt collector in writing that the consumer refuses to pay the debt or that the consumer wishes the debt collector to cease further communication with the consumer."  15 U.S.C. 1692c(c).

Section 1692e(11) requires a debt collector to disclose "in the initial communication with the consumer," whether written or oral, "that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose."  15 U.S.C. § 1692e(11).  In addition, § 1692e(11) requires that all "subsequent communications"  disclose that the "communication is from a debt collector."

While each section prohibits slightly different actions, as a threshold matter, all sections require (1) a debt collector and (2) a communication before liability under the Act will attach.

### B.  "Debt Collector"

Because the Aulds allege that Shellpoint and MCS are vicariously liable for Waldron's actions, for liability to attach under the Act Waldron must be a "debt collector" subject to the Act's requirements.

The Act primarily defines "debt collector" in two ways: "any person . . . in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."[3] *Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1035–36 (2019) (quoting 15 U.S.C. § 1692a(6)).  It appears the parties agree that Waldron does not qualify as a debt collector under the "principal purpose" definition; the question is thus whether Waldron "regularly collects or attempts to collect, directly or indirectly, debts" owed to another.  15 U.S.C. § 1692a(6); *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1721, (2017).  The Aulds argue that because Waldon was gathering information, he is an indirect debt collector.

While gathering information may in some cases be linked to collecting debt, the parties have not provided and the Court has not discovered any case that conflates the two.  To the contrary, it appears that every case on this point requires some action by the

---

[3] The Act also provides a secondary definition limited to § 1692f(6) involving the enforcement of security interests.  *Obduskey*, 139 S. Ct. at 1036.  By expressly stating that businesses with the principal purpose of enforcing a security interest are "debt collectors" for purposes of 1692f, the statute implies that these individuals are not "debt collectors" under the primary definition.  *Id.* at 1037.  Thus, unless § 1692f(6) is at issue, persons acting with the principal purpose of enforcing a security interest are not "debt collectors" under the Act.  *Id.* at 1038.  Here, because Shellpoint has not demonstrated any state law that requires property inspections to enforce a security interest, this secondary definition does not apply.  *Cf. Obduskey*, 139 S.Ct. at 1039 (noting in part that a communication from a law firm to a consumer about potential foreclosure proceedings was required by law and that law firm initiating foreclosure proceeding was not a debt collector under the Act because it was enforcing a security interest).

entity to actually collect or attempt to collect the debt on a regular basis as opposed to merely gathering information. For example, in *Schlaf v. Safeguard Properties, LLC*, the Seventh Circuit found property inspection companies that contracted with mortgage servicers were not debt collectors when (1) the servicer provided no information about the debt to the property inspector; (2) the property inspector did not have discretion to conduct inspections based on likelihood of repayment; and (3) made no attempt to collect payments and instructed its employees not to discuss the debt with the mortgagor. *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 468 (7th Cir. 2018).

In another illustration, in *Romine v. Diversified Collection Services, Inc.,* the Ninth Circuit found that Western Union's talking-telegram service could be considered an indirect debt collection when Western Union advertised its talking-telegram as a "revolutionary new collections service" that was "specially developed for the credit and collections industry" to "stimulate recoveries dramatically." 155 F.3d 1142, 1147 (9th Cir. 1998). The service included delivery of a "debt collection message" along with a follow up "mailgram" confirming receipt of the debt collection message. *Id.* at 1144. There, the Court concluded Western Union went "beyond mere information gathering or message delivery" and waded into debt collection. *Id.* at 1147.

Here, the Aulds have provided no evidence that could lead a reasonable jury to conclude that Shellpoint provided MCS or Waldron with specific information about the debts owed, or that Waldron had discretion to inspect certain properties that were more

likely to repay the debt. And while the Aulds argue Waldron was required to conduct an interview by the Shellpoint-MCS contract, the Aulds distort the clear contractual language to reach this conclusion. In fact, the contract clearly prevents MCS or its agent from taking any action related to the collection of any debt and from making any statements to the mortgagor about the debt. (Shellpoint-MCS Contract at 14, § 1.15 ("Communications with Mortgagors."))[4]

Thus, the persuasive case law supports finding that Waldron is not a "debt collector" subject to the Act's requirements because he was not someone "who regularly collects or attempts to collect, directly or indirectly, debts" owed to another. *Obduskey*, 139 S. Ct. at 1036 (quoting 15 U.S.C. § 1692a(6)). The Court therefore finds that no genuine dispute of fact remains, and that Waldron was not a "debt collector" under the Act.

Because Waldron must be a "debt collector" for liability to attach to MCS or Shellpoint under a vicarious liability theory, and the Court has determined he is not, the Auld's claims under the Act in Count I fail as a matter of law and the Court need not reach

---

[4] The clause in full states that "[MCS] shall attempt to conduct a personal interview with the mortgagor(s), but only in accordance with [Shellpoint's] specific instructions. [MCS] shall advise the mortgagor(s) to contact [Shellpoint] regarding an important matter. [MCS] shall not take any action related to the collection of any payments that may be due or accept any payment of funds on behalf of [Shellpoint]. [MCS] shall make no statements or representations as to the amount past due, if any, on the mortgage loan payment. On any inquiry from the mortgagor(s) regarding payments, the inspector shall refer the mortgagor(s) to [Shellpoint]. [MCS] shall not at [sic] represent itself as or hold itself out as an employee of [Shellpoint]."

the issue of whether the interaction between Waldron and Scott Auld contained a communication or whether Shellpoint or MCS can be held vicariously liable for Waldron's actions. Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to Count I.

**III. COUNTS II-IV: THE EVENTS OF MAY 10, 2017**

The Auld's claims in Counts II–IV all stem from the actions of an unidentified party who reported concerns about the Auld's mold problem to Hennepin County Human Services on May 10, 2017. The Aulds admit that they do not actually know the identity of the reporter, but state that they "know" that it was Shellpoint because "circumstantial evidence" supports their theory and they "can't think of anybody else" that would make the report.[5] The Aulds point to the letter their attorney sent to Shellpoint in February 2017 that mentioned the need for "major mold abatement," the fact that an occupancy inspection was conducted the same day the report was made, and the fact that the reporter called Hennepin County back a week after the initial report and stated the Aulds had not allowed inspections for mold to occur in recent years.

However, Shellpoint was not the only party that was aware that the home had a problem with mold. The Aulds acknowledge that the home's issues with mold were well

---

[5] For its part, Shellpoint denies knowledge that it or any of its agents made the report and the county employee that took the report also testified that she does not recall ever receiving a report from an employee of a mortgage company.

known in the community and that they were working with the city, county, and state to fix the issue.  Nor have the Aulds demonstrated any link between the May 10, 2017 occupancy inspection—that occurred outside the home and did not include contact with anyone—and the reporter's claims that the Aulds had not allowed inspections for mold to occur inside the home.

Finally, the Aulds themselves chose not to further investigate the reporter.  The Magistrate Judge stated that if the Aulds could not discover the identity of the reporter using reasonable means, she would strongly consider a motion to compel Hennepin County Human Services to reveal the identity of the reporter *in camera* to determine whether the reporter was a Shellpoint employee or agent.  The Aulds, however, made no such motion and instead choose to rely on the evidence presented here.

As a result, the Aulds present nothing more than "mere speculation, conjecture, or fantasy" to support their claims against Shellpoint and John Doe in Counts II-IV.  *Moody v. St. Charles Cty.*, 23 F.3d 1410, 1412 (8th Cir. 1994).  This is insufficient to withstand a motion for summary judgment.  *Id.*  Accordingly, the Court will grant Shellpoint's Motion for Summary Judgment on Counts II-IV as no genuine dispute of fact remains and Shellpoint is entitled to judgment as a matter of law.

### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant New Penn Financial LLC's (d/b/a Shellpoint Mortgage Servicing) Motion for Summary Judgment [Docket No. 117] is **GRANTED**.

2. Defendant MCS's Motion for Summary Judgment [Docket 120] is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  July 1, 2020  
at Minneapolis, Minnesota.

_____ /s/ John R. Tunheim _____  
JOHN R. TUNHEIM  
Chief Judge  
United States District Court